# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 24-1439V**

| | |
|---|---|
| MONA BALLARD,<br><br>Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | Chief Special Master Corcoran<br><br>Filed: October 13, 2026 |

*Kimberly Sloan, Maglio Christopher & Toale, PA, Seattle, WA, for Petitioner.*

*Irene Angelica Firippis, U.S. Department of Justice, Washington, DC, for Respondent.*

## DECISION AWARDING DAMAGES[1]

On September 16, 2024, Mona Ballard filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered Guillain-Barré syndrome ("GBS") as a result of an influenza ("flu") vaccine she received on November 21, 2023. Petition at 1-5 Although Respondent conceded that Petitioner is entitled to compensation, the parties were unable to resolve damages, and have now briefed the matter (ECF Nos. 28, 30).

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the amount **$135,000.00 for past pain and suffering, plus $5,182.79 for unreimbursable expenses.**

## I. Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining GBS damages, taking into account prior compensation determinations within SPU. I fully adopt and hereby incorporate my prior discussion in Sections I-II of *Jones v. Sec'y of Health & Human Servs.*, No. 24-1697V, 2026 WL 1008169, at *1-4 (Fed. Cl. Spec. Mstr. Mar. 10, 2026).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[3]

## II. Relevant Medical History

Petitioner received a flu vaccine on November 21, 2023. Ex. 1 at 3. Ten days later (December 1, 2023), she was seen in an emergency department ("ED") reporting new onset of bilateral numbness of her feet as well as tingling and pain. Ex. 2 at 94. Her symptoms had begun two days earlier and progressively worsened. *Id*. She had gone to urgent care and was sent to the ED due to concern for GBS. *Id*. The ED physician described her symptoms as "relatively mild," but concerning for GBS, which could progress rapidly. *Id*. She was assessed with progressive distal lower extremity numbness, pain, and weakness, and admitted for possible GBS. *Id*. at 98.

A lumbar puncture did not show elevated protein. Ex. 2 at 37. Nevertheless, Petitioner was diagnosed with, and treated for, GBS based on her clinical presentation. *Id*. She improved after five days of IVIG, although she remained "well below her baseline," and was discharged on December 8, 2023. *Id*. at 37-38, 50. While hospitalized, she did

[3] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

not suffer any major complications, and underwent physical and occupational therapy, as well as a speech therapy consultation. *Id*. at 37.

Petitioner was transferred from the hospital to an inpatient rehabilitation facility on December 8, 2023. Ex. 4 at 38. Prior to developing GBS, Petitioner had been independent with ambulation and routine activities of daily living. *Id*. at 44. On admission to the rehabilitation facility, she required supervision and minimal assistance with transferring in and out of bed, bathing, and dressing. *Id*. at 44-45. During her stay, she suffered from “quite a bit of issues with lightheadedness” that affected her therapies, requiring rest breaks. *Id*. at 120. This symptom resolved when she stopped a medication. *Id*. She was discharged on December 18, 2023. *Id*. At the time of discharge, she continued to exhibit lower extremity weakness on examination. *Id*. at 121.

On January 4, 2024, Petitioner followed up with her neurologist. Ex. 2 at 19. She continued to experience tingling sensations in her feet, though they had improved. *Id*. at 20. Her toes and heels remained numb, but the numbness no longer reached her knees. *Id*. She did not have any sensory symptoms remaining in her hands or arms. *Id*. She estimated her strength at 50% of normal, and was receiving an hour of physical therapy five days a week at home. *Id*. She exhibited a wide and unsteady gait and diminished reflexes. *Id*.

Petitioner began outpatient physical therapy (“PT”) in December 2023, attending approximately 20-30 sessions between December 21, 2023 and February 15, 2024. Ex. 9 at 3-35. By February 15, 2024, Petitioner had met all PT treatment goals and was discharged. *Id*. at 3. She could now tolerate a kneeling position and return to standing without assistance, and her ambulation and risk of falling had improved. *Id*. The therapist noted that she had returned to her previous level of function with independence, and was now able to engage in all functional and leisure activities safely and without difficulty. *Id*. at 4. Her prognosis was “excellent,” and she was instructed to continue exercises at home. *Id*.

At an April 15, 2024 appointment for an unrelated condition, Petitioner did not report any residual GBS symptoms. Ex. 12 at 2. On June 18, 2024, she saw a specialist for an unrelated condition and reported that she continued to recover from GBS, and now only had trouble climbing stairs. Ex. 16 at 38.

Petitioner returned to her neurologist on July 5, 2024, reporting that she had now returned to full strength, although she continued to experience mild symptoms in her feet and toes. Ex. 15 at 5-6. On examination, her reflexes and gait had returned to normal. *Id*. at 7. She was noted as having a “near full recovery,” and was directed to follow up as needed. *Id*.

## III. Testimonial Evidence

Petitioner has filed two declarations in support of her claim. Exs. 17, 20. She states that a week after vaccination, her lower back began to hurt after doing yard work. Ex. 20 at ¶ 2. She thought she had pinched a nerve and made a chiropractor appointment. *Id*. The following day while getting her mail, her knee gave out and she nearly fell. *Id*. at ¶ 3. Later that day, her knee again gave out when climbing stairs at home. *Id*.

On November 30, 2023 (nine days after vaccination), Petitioner's daughter (a nurse) noticed that Petitioner was walking differently, and she felt weaker than usual. Ex. 20 at ¶ 4. The following day (December 1, 2023), her son took her to see the chiropractor, who told her there was nothing wrong with her back and she should go to urgent care. *Id*. at ¶ 5. As she was leaving, she fell and could not get up without assistance. *Id*. She went to urgent care, and they suspected GBS and sent her to the ED. *Id*.

Petitioner states that prior to her GBS diagnosis, she had no limitations, and was able to do all of her own housework, yard work, shopping, and self-care, and could babysit her grandkids, walk without limitations, climb stairs independently, care for her elderly father, write, and engage in leisure activities such as knitting, crocheting, and working puzzles. Ex. 20 at ¶ 7. Now, she has difficulty writing, and had grab bars installed in her bathroom. *Id*. at ¶ 8. She needs to use a shopping cart for support in stores, and had wider steps with rails installed in her backyard. *Id*. She needs to take breaks while doing household chores, cannot knit and crochet as much, and has difficulty picking up puzzle pieces. *Id*. She has difficulty going up and down stairs, and when getting out of bed needs to stand in place briefly before taking a step. *Id*. Swinging her legs to get out of a car is difficult. *Id*.

## IV. The Parties' Arguments

Petitioner requests an award of $200,000.00 for actual pain and suffering, citing *Hood*, in which the claimant received that sum (in addition to a component of future pain and suffering), and *Glover*, and *Rodriguez*, in which the claimants were each awarded $145,000.00.[4] Petitioner's Motion in Support of Damages, filed Aug. 26, 2025, at *7-11 (ECF No. 28) ("Mot."). Petitioner characterizes her battle with GBS as "severe and significant." Mot. at *8. She asserts that her hospital stay was longer than that of the *Hood* claimant, while both stayed in inpatient rehabilitation facilities for ten days and required outpatient therapy. *Id*.

---

[4] *Hood v. Sec'y of Health & Human Servs*., No. 16-1042V, 2021 WL 5755324 (Fed. Cl. Spec. Mstr. Oct. 19, 2021); *Glover v. Sec'y of Health & Human Servs*., No. 23-0406V, 2025 WL 2092128 (Fed. Cl. Spec. Mstr. June 23, 2025); and *Rodriguez v. Sec'y of Health & Human Servs*., No. 23-0591V, 2025 WL 1927640 (Fed. Cl. Spec. Mstr. June 23, 2025).

Petitioner asserts that like the *Hood* petitioner, her GBS treatment "persisted for months" after inpatient treatment, citing a few months of PT in early 2024 and a July 2024 report of an ongoing tingling sensation in her feet. Mot. at *9. She acknowledges, however, that the *Hood* petitioner continued to experience GBS sequelae for *over six years*.[5] *Id*. at *8.

Respondent proposes a pain and suffering award of $100,000.00, citing decisions in *Koonce*, *Granville*, and *Castellanos*, in which the petitioners received pain and suffering awards of $70,000.00,[6] $92,500.00, and $125,000.00, respectively.[7] Response, filed Oct. 27, 2025 (ECF No. 30) ("Resp."). Respondent describes Petitioner as experiencing moderate pain and a brief course of care, significantly recovering and being able to participate in all functional and leisure activities safely without difficulty within three months after the onset of her condition. Resp. at *5. At her final appointment, she was noted to have made a "near full recovery," with mild persisting residual effects. *Id*. Although Petitioner asserts that she continues to experience hand weakness, this is not documented in medical records, and no treater has attributed it to GBS. *Id*.

## V. Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

In performing this analysis, I have reviewed the record as a whole, including the medical treatment evidence, affidavits, and all assertions made by the parties in written documents. I considered prior awards for pain and suffering in both SPU and non-SPU GBS cases and rely upon my experience adjudicating these cases. However, I ultimately base my determination on the circumstances of this case.

The evidence shows that Petitioner, then 73 years old, suffered a course of GBS that was on the milder side – although I acknowledge that even a relatively mild case of

---

[5] *Hood* is simply not comparable to Petitioner's case. In addition to suffering continued sequelae for over six years, the *Hood* petitioner also engaged in intensive outpatient PT (two to three sessions a week) for at least nine months, received IVIG on an ongoing basis after discharge, continued to walk with a cane seven months after his condition began, and nearly six years thereafter still could not drive because foot numbness prevented him from feeling the pedals.

[6] The *Koonce* petitioner also received a pain and suffering award for a separate injury (Bell's palsy).

[7] *Koonce v. Sec'y of Health & Human Servs*., No. 21-1560V, 2024 WL 3567368 (Fed. Cl. Spec. Mstr. July 8, 2024); *Granville v. Sec'y of Health & Human Servs*., No. 21-2098V, 2023 WL 6441388 (Fed. Cl. Spec. Mstr. Aug. 30, 2023); and *Castellanos v. Sec'y of Health & Human Servs*., No. 19-1710V, 2022 WL 1482497 (Fed. Cl. Spec. Mstr. March 30, 2022).

GBS is serious and frightening (and I take that into account in determining the amount of Petitioner's pain and suffering award). Petitioner's symptoms began approximately a week after vaccination, and were described as "relatively mild" in the ED. However, she was admitted for suspected GBS due to the potential for her condition to progress rapidly. She underwent a lumbar puncture and a five-day course of IVIG.

Petitioner was hospitalized for seven days, after which she spent ten days in an inpatient rehabilitation facility. She then returned home and attended outpatient PT for approximately two months. She saw her neurologist on an outpatient basis shortly after returning home, and thereafter did not see him again until six months later. At her final neurology appointment, seven months after the onset of her condition, she had experienced a "near full recovery," and was instructed to follow up as needed.

Petitioner's illness and treatment course fall between *Castellanos*, on one end of the spectrum, and *Glover* and *Rodriguez* on the other. The *Castellanos* petitioner endured longer hospital and inpatient rehabilitation stays, as well as persistent mobility deficits and residual effects. However, these were viewed as at least partially attributable to an unrelated pre-existing medical condition. While the *Glover* and *Rodriguez* petitioners were discharged directly home (rather than to an inpatient rehabilitation facility), in *Glover* inpatient rehabilitation was recommended but declined due to COVID-19 fears (in late 2020). Importantly, the *Glover* and *Rodriguez* claimants experienced residual effects for significantly longer than Ms. Ballard.

After considering the entire record and the parties' arguments, I find that **$135,000.00 in compensation for actual pain and suffering** is reasonable and appropriate in this case.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $135,000.00 represents a fair and appropriate amount of compensation for Petitioner's past/actual pain and suffering.[8] Additionally, Petitioner is entitled to $5,182.79 in unreimbursable expenses**.[9]

---

[8] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[9] The parties agree that this sum is reimbursable. Mot. at *10; Resp. at *2.

**I therefore award Petitioner a lump sum payment of $140,182.79, representing compensation for his actual pain and suffering, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[10]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

[10] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.